## NOLAN MOTORS, INC., *v.* JOHN J. GHINGHER, RECEIVER.

[No. 29, October Term, 1935.]

*Decided December 4th, 1935.*

The cause was submitted on briefs to BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*C. Walter Baker,* for the appellant.

*Edward Oswald, Jr.,* for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The single question involved in this appeal is whether a set-off is allowable under the undisputed facts in the case.

The case was heard upon petition and answer, and the facts are as follows: On March 4th, 1933, the Nolan Motors Corporation had on deposit with the Hagerstown Bank & Trust Company, hereinafter designated as the bank, the sum of $2,380.05. At the same time the corporation was, and for some time prior thereto had been, the lessee of a garage property owned by the bank and located in the City of Hagerstown, Maryland. Upon that date, under the provisions of chapter 46 of the Acts of the General Assembly of Maryland, passed at the session of 1933, commonly known as the "Emergency Banking Act," John J. Ghingher, as bank commissioner for the State of Maryland, assumed charge of the custody, control, and management of said bank. He continued to exercise such authority over its affairs until December 3rd, 1934, when, in the exercise of the general power and authority vested in him by section 9 of article 11 of the Annotated Code of Maryland, title "Banks and Trust Companies," as supplemented by section 71F of the Emergency Act, he assumed control of its affairs as receiver. All rent due prior to March 4th, 1933, had been paid by the appellant, but after that date it ceased to pay rent, although it continued to use and occupy the premises. On November 2nd, 1934, the amount of overdue rent became equal to the deposit hereinbefore mentioned. Since the latter date, the petition alleges and the answer admits, the corporation has resumed the payment of its rent, and the receiver has been collecting it.

Section 9, to which reference is above made, clothes the state bank commissioner with general authority, upon obtaining the written consent of the Governor and Attor-

ney General, to take possession of the property and business of any financial institution found conducting its business in an unsafe or unauthorized manner, or the capital of which is impaired. It further provides that the commissioner, upon assuming control of such institution, shall forthwith give notice of such action to all individuals or institutions holding or in possession of assets belonging to the impaired institution. Upon giving such notice, it is provided that: "The property, assets and business of such institution shall be considered to be in the possession of the Bank Commissioner, which fact shall operate as a bar to any and all attachments, liens, executions or distraints of any kind, and shall also operate to place the assets of said institution in the hands of said Bank Commissioner, as receiver, the same as if he had been appointed by an order of court. Such institution may with the consent of the Bank Commissioner, or with the consent of the court, resume business upon such conditions as the Bank Commissioner may approve. Immediately upon taking possession of the property and business of said institution the Bank Commissioner shall forthwith cause proper proceedings to be instituted in the name of the State of Maryland versus said institution, in a court of competent jurisdiction, for the purpose of having the court assume jurisdiction over its property and business for final liquidation."

Such was the law prior to the passage of the Emergency Banking Act, which supplemented article 11 by adding 17 new sections thereto. As is shown by sections 71A and 71B of this latter act, the bank commissioner was required to take custody, control, and management of all financial institutions then doing business under the provisions of article 11; and all remedies at law and in equity against such institutions were suspended, until such time as the Governor, by proclamation, within the period of one year or an extension thereof, under the provisions of the act, might terminate such control and suspension of remedies.

Section 71B further provides as follows: "Provided, however, that nothing herein contained shall be construed to prevent any depositor or creditor of a banking institution from exercising his rights against any collateral security he may hold for his claim, or to prevent such institution from redeeming such collateral security, or to impair or postpone any right of set-off, but no debtor shall have the right to set-off any credit extended or deposit made before the passage of this Act against any obligations arising after the passage of this Act."

It will thus be observed that what the appellant now seeks is to set off its deposit credit, acquired prior to March 4th, 1933, against rents due by it to the bank, which accrued after that date, notwithstanding the provisions of section 71B, in direct conflict with such an allowance.

In support of its contention, it is argued on behalf of the appellant that the rent accrued before the actual date on which the commissioner was appointed receiver of the bank, namely, December 3rd, 1934, and that when the commissioner exercised the powers of receivership conferred upon him by section 9 of article 11, in accordance with section 71F of the Emergency Act, then all suspension of remedies and extension of deposits or debts (provided in section 71B), ceased and determined. But the provision of section 71B, it will be noted, is not a suspension of any remedy; to the contrary, it is a clear and unambiguous denial of any right to set-off a deposit against a liability arising after the passage of the Emergency Act, so long as the control and custody of the bank is retained by the commissioner, regardless of receivership.

The Emergency Banking Act, as its title implies, was passed to meet a financial crisis; and the plain purpose of the act was not only to place unsound banking institutions under the protection of the bank commissioner, and prevent "runs" upon them, but likewise to protect institutions, the capital and assets of which were, at the time of the passage of the act, amply sufficient to meet their

liabilities, but which, nevertheless, were confronted with a panicky and abnormal condition among depositors. Accordingly, all banks, on the date upon which the act went into effect, March 4th, 1933, automatically came under the control and management of the bank commissioner, with authority on his part, first, to permit a bank to exempt itself from the provisions of the act, upon satisfactory proof of its solvency; secondly, to approve plans for reorganization of impaired banks, whereby they might become exempt from the provisions of the act; and, thirdly, to continue control and management of the remaining institutions, and finally liquidate them through receivership. The act was designed to prevent discrimination and to preserve existing rights among bank creditors at the time of its passage; and it can readily be assumed that the set-off provision found therein was necessary to carry into effect the above purposes.

In the instant case, it is our opinion that the right of set-off must be determined as of the date the act went into effect, and not as of the date of the receivership of the bank. To rule otherwise, would result in placing in a preferred position all depositors who became indebted to the bank during the period between March 4th, 1933, and December 3rd, 1934; and it must be remembered that during that period, rights to withdraw old deposits were stayed, because the bank remained under the control of the commissioner, from the date of the act to the date of the receivership, as conservator. Thereafter, it continued under his control as receiver. It would seem unjust and inequitable for the commissioner, while exercising control and management of the bank, as conservator, to permit a depositor to use and occupy property belonging to the institution and thereby collect, by way of unpaid rent, the full amount of his deposit, as against depositors who, under the circumstances of the case, will eventually share only in the final liquidation of the bank.

For the reasons stated, the decree appealed from will be affirmed.

*Decree affirmed, with costs to the appellee.*